**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JASON GORDON, ARIE WEISSMANN, and JOHNNY HARRIS, individually, on behalf of themselves and all others similarly situated,<br><br>     *Plaintiffs,*<br><br>     v.<br><br>DRAFTKINGS, INC. and GUS III, LLC d/b/a DRAFTKINGS PREDICTIONS,<br>     *Defendants.* | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Case No._____ |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Jason Gordon, Arie Weissmann, and Johnny Harris (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, hereby allege the following against Defendants DraftKings, Inc. and GUS III, LLC d/b/a DraftKings Predictions (collectively, "DraftKings" or "Defendants") based upon, inter alia, the investigation made by their counsel, and based upon information and belief, except as to those allegations and experiences specifically pertaining to Plaintiffs which are based upon their personal knowledge.

## NATURE OF THE CASE

1. DraftKings is a leading U.S. online and app-based sports gambling platform with licensed mobile and/or retail sportsbook operations in many states across the country. However, there are a number of states that have not granted DraftKings a license to operate a sportsbook. These states either outright prohibit sports gambling or require sportsbook operators to obtain a license but have not issued a license to DraftKings.

2. After years of not operating in these states, DraftKings has now attempted to

circumvent the laws of these states banning its sportsbook operations.

3.      Through its wholly owned subsidiary, GUS III, LLC d/b/a DraftKings Predictions, DraftKings now operates "DraftKings Predictions" in these states, offering online and app-based sports betting that is masqueraded as "event contracts" in states where unlicensed sports betting is categorically illegal.

4.      DraftKings markets its sports prediction products as event contracts or "trading," rather than sports betting, creating the misleading impression that the products are fundamentally different from, and more lawful than, traditional wagers. DraftKings capitalizes on its reputation as a licensed sportsbook by marketing Predictions to the same customer base and through the same platform, despite offering an unlicensed product that is, in substance, indistinguishable from sports betting.

5.      By operating an unlicensed sports betting platform, DraftKings has violated Massachusetts gambling laws and unjustly enriched itself at the expense of consumers. Plaintiffs, on behalf of themselves and a Class of similarly situated individuals, bring this lawsuit to recover the amounts that DraftKings Predictions has unlawfully taken from them, as well as costs and attorneys' fees.

## PARTIES

### *Plaintiffs*

6.      Plaintiff Jason Gordon is a natural person and citizen of Texas. Mr. Gordon enrolled in DraftKings Predictions through the DraftKings app in or about December 2025.

7.      Like all DraftKings Predictions users, in order to open his account, Mr. Gordon was required to, and did, assent to the DraftKings Predictions Terms of Use, which provide that the parties' agreements are governed by the substantive law of the Commonwealth of Massachusetts

and that all claims arising out of or relating to his account, the DraftKings Predictions app, or the services must be brought in a court sitting in Boston, Massachusetts. Before he wagered and lost money, DraftKings did not disclose that Predictions operated as an unlicensed sportsbook, that DraftKings and its affiliates could and did take positions opposite his own, or that DraftKings profited on every transaction regardless of outcome.

8.      Plaintiff Arie Weissmann is a natural person and citizen of Texas. Mr. Weissmann enrolled in DraftKings Predictions through the DraftKings app while located in Texas in or about January 2026.

9.      Like all DraftKings Predictions users, in order to open his account, Mr. Weissmann was required to, and did, assent to the DraftKings Predictions Terms of Use, including their Massachusetts choice-of-law and Boston forum provisions. Before he wagered and lost money, DraftKings did not disclose that Predictions operated as an unlicensed sportsbook, that DraftKings and its affiliates could and did take positions opposite his own, or that DraftKings profited on every transaction regardless of outcome.

10.     Plaintiff Johnny Harris is a natural person and citizen of California. Mr. Harris enrolled in DraftKings Predictions through the DraftKings app in or about March 2026.

11.     Like all DraftKings Predictions users, in order to open his account, Mr. Harris was required to, and did, assent to the DraftKings Predictions Terms of Use, including their Massachusetts choice-of-law and Boston forum provisions. Before he wagered and lost money, DraftKings did not disclose that Predictions operated as an unlicensed sportsbook, that DraftKings and its affiliates could and did take positions opposite his own, or that DraftKings profited on every transaction regardless of outcome.

*Defendants*

12.     Defendant DraftKings, Inc. is a Nevada corporation with its principal place of business and corporate headquarters at 222 Berkeley Street, Boston, Massachusetts 02116. DraftKings regularly conducts substantial business in all 50 states, the District of Columbia, and Puerto Rico. DraftKings operates a digital gaming platform offering sports betting, online casino gaming, daily fantasy sports, lottery services, and event contracts through its DraftKings Predictions platform.

13.     DraftKings directs, controls, and profits from the DraftKings Predictions business from its Boston headquarters, where its executive leadership, marketing, product, legal, and compliance functions are located, and from which the conduct challenged in this action was conceived, approved, implemented, and supervised.

14.     Defendant GUS III, LLC d/b/a DraftKings Predictions is a Nevada limited liability company with its headquarters in Boston, Massachusetts and is a wholly owned subsidiary of DraftKings, Inc. Through DraftKings Predictions, GUS III LLC offers sports event contracts integrated into the DraftKings Sports application.

15.     GUS III LLC designs, prices, presents, markets, and controls the customer-facing DraftKings Predictions product, sets the parameters of the markets its users may enter, receives transaction fees on every trade, and receives discounts, rebates, payments, or other consideration from exchanges and other parties in exchange for routing customer orders, which it is authorized to retain for its own account.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there exists minimal diversity between class

members and Defendants and because the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

17.     This Court has personal jurisdiction over Defendants. Both Defendants are headquartered in and operate their businesses primarily from Boston, Massachusetts, and are therefore at home in this District. In addition, Defendants have consented to personal jurisdiction and venue in this District: in the DraftKings Predictions Terms of Use that Defendants drafted and required each Plaintiff and Class member to accept, Defendants designated "the courts of competent jurisdiction sitting within Boston, Massachusetts" as the exclusive forum for "any and all disputes, claims, causes of action, or controversies arising out of or relating to the Agreements, the breach thereof, your Draftkings Predictions Account, access to, or use of, the DraftKings Predictions App, or access to, or use of, the Services," and irrevocably waived any objection to that forum.

18.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in and emanated from this District.

19.     Venue is likewise proper because Defendants designated this forum in their own Terms of Use and agreed to pay the attorneys' fees of DraftKings Predictions if a customer files suit anywhere else. Defendants cannot contend that litigation of these claims in Massachusetts, under Massachusetts law, is improper or inconvenient when they drafted the very provisions that compel it.

20.     Defendants drafted, and required every DraftKings Predictions customer to accept as a condition of opening an account, the DraftKings Predictions Terms of Use (the "Terms of Use"), last updated December 23, 2025. The Terms of Use, together with the DraftKings Predictions Privacy Notice, the eSign Disclosure, the Event Contracts Risk Disclosure, and the

5

other terms incorporated by reference, are defined in the Terms of Use as the "Agreements," and they govern the creation and use of every DraftKings Predictions account, access to and use of the DraftKings Predictions app, and access to and use of the services, including the placement of every event contract transaction.

21.    Under the heading "CONSENT TO JURISDICTION IN MASSACHUSETTS, CHOICE OF LAW, ATTORNEYS' FEES," the Terms of Use provide: "The Agreements shall be governed by the internal substantive laws of the Commonwealth of Massachusetts, without respect to its conflict of laws principles or any other law or regulation that would permit or require the application of the substantive laws of any jurisdiction other than the Commonwealth of Massachusetts." The same provision designates "the courts of competent jurisdiction sitting within Boston, Massachusetts" as the exclusive "Forum" for "any and all disputes, claims, causes of action, or controversies arising out of or relating to the Agreements, the breach thereof, your Draftkings Predictions Account, access to, or use of, the DraftKings Predictions App, or access to, or use of, the Services, including, without limitation, any Commodity Transactions through the Services," which the Terms of Use define as "Claims."

22.    Each Plaintiff and each Class member accepted these provisions by creating a DraftKings Predictions account and using the services. Defendants have therefore contracted for the application of Massachusetts substantive law to the claims asserted in this action.

23.    Independent of the parties' agreement, Massachusetts is the state with the most significant relationship to the claims alleged and the state in which the challenged conduct occurred primarily and substantially. The decisions to launch DraftKings Predictions in states where DraftKings could not obtain a sportsbook license, to market the product to DraftKings' existing sportsbook customers, to describe wagers as "trading" and "event contracts," to omit the

responsible-gaming safeguards required of licensed operators, to set the fee structure and the manner in which fees are disclosed, and to withhold from consumers that DraftKings and its affiliates may take the other side of their positions, were each made by Defendants' personnel in Boston, Massachusetts. The deceptive scheme was designed in Massachusetts and disseminated nationwide from Massachusetts.

24.    Defendants' conduct also occurred in the conduct of "trade or commerce" as G.L. c. 93A, § 1(b) defines that term, because it involved the advertising, offering for sale, and distribution of services "directly or indirectly affecting the people of" the Commonwealth.

## FACTUAL ALLEGATIONS

### A.    ONLINE SPORTS BETTING IS REGULATED BY STATES.

25.    Gambling, including sports wagering, is one of the most heavily regulated industries in the United States. States have long recognized that gambling presents substantial risks to consumers, including addiction, financial exploitation, and deceptive business practices. As a result, states strictly regulate who may offer wagering services and under what conditions those services may operate.

26.    In the modern era of sports gambling, now widely accessible through mobile applications and online platforms from virtually every home in America, the Supreme Court has unequivocally held that the authority to regulate such conduct rests with the states. As the Court explained, "[t]he legalization of sports gambling requires an important policy choice, but the choice is not ours to make. Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 486, 138 S. Ct. 1461, 1484–85 (2018).

27.    Consistent with *Murphy*, legislatures across the country have adopted their own

statutory frameworks governing gambling activity within their borders. These frameworks vary significantly, reflecting each state's policy judgment about the risks and benefits of gambling.

28.    As seen in practice, sportsbooks that are authorized in certain jurisdictions implement technological safeguards, including geolocation blockers tied to a user's mobile device and IP address, to prevent wagers from being placed in jurisdictions where such activity would violate state law.

**B.    THE NEW "PREDICTION MARKET" INDUSTRY USED TO CIRCUMVENT STATE SPORTS BETTING LAWS.**

29.    In recent years, a new category of online sports betting platforms has emerged to circumvent the laws of states that ban sports wagers: "prediction markets."

30.    "Prediction markets" purport to offer users "event contracts" tied to the outcome of future events, including sports. These "prediction markets" claim that users are not placing wagers but instead participating in a financial market based on predictions about real-world events.

31.    Users on a prediction market platform can speculate on the outcome of a sporting event by purchasing and selling contracts tied to whether a particular event will occur through binary propositions, such as whether a team will win the game. Users buy these contracts corresponding to either a "yes" or "no" outcome for whether the team will win.

32.    Just like a sportsbook, the event contract is priced by the platform on a scale reflecting the platform's estimate of the likelihood that the event will occur, but building in a margin, or "vig," for the platform on both sides of the transaction.

33.    Users may purchase "contracts" at the "price" and receive a fixed payout if the predicted outcome occurs. If the outcome does not occur, the contract expires worthless and the user loses the amount paid to acquire it.

34.    This system is the same as traditional sports betting. Participants risk money on the

result of a game, with the possibility of financial gain or loss depending entirely on the outcome of the game.

35.    While prediction market operators frequently describe these wagers as "event contracts" or "market positions," the underlying activity remains a form of speculation on sporting events. The terminology used by the platform does not alter the fundamental structure of the transaction: users stake money in exchange for the possibility of receiving a greater monetary payout if their prediction on a sports game proves correct.

36.    Defendants are not the first to offer this "prediction market" format of sports gambling. Kalshi, a New York based company that operates one of the leading "prediction market" platforms through its app and website, first employed this model that Defendants now seek to replicate.

37.    Prediction market operators like Kalshi contend that their platforms are not gambling enterprises but instead federally regulated financial exchanges, asserting that their "event contracts" are derivatives subject to oversight by the Commodity Futures Trading Commission ("CFTC") under the Commodity Exchange Act. Kalshi, for example, operates a platform approved as a designated contract market under the Commodity Exchange Act and therefore claims that its event contracts fall within the regulatory jurisdiction of the CFTC rather than state gambling authorities.

38.    This flawed theory—that these "prediction market" sports wagers are not subject to state laws that prohibit unregulated sports wagering—has already been rejected by courts across the country, including in Massachusetts. *Commonwealth v. KalshiEX LLC, No.* 2584CV02525, Mem. & Order on Pl.'s Mot. for Prelim. Inj. and Def.'s Mot. to Dismiss (Mass. Super. Ct. Suffolk Cnty. Jan. 20, 2026) (denying Kalshi's motion to dismiss on federal preemption grounds and

granting the Attorney General's request for preliminary injunctive relief after concluding that Kalshi lacked a lawful sports wagering license to offer sports event contracts in Massachusetts); *State v. KalshiEX LLC,* No. 26-2-11368-8 SEA, Order Granting Pl.'s Mot. for Prelim. Inj. (Wash. Super. Ct., King Cnty. July 21, 2026); *State ex rel. Nev. Gaming Control Bd. v. Coinbase Fin. Mkts., Inc.*, No. 26 OC 000301B, Order Granting Pl.'s Mot. for Prelim. Inj. (Nev. Dist. Ct., Carson City Mar. 26, 2026). Numerous states have also sent cease-and-desist letters to prediction markets operating within their states.[1]

## C.    AFTER YEARS OF COMPLYING WITH STATE GAMBLING LAWS, DRAFTKINGS PIVOTED AND CREATED "DRAFTKINGS PREDICTIONS" TO SKIRT THOSE LAWS.

39.    Beginning in 2018, DraftKings has traditionally operated its sportsbook within the well-established regulatory framework governing sports wagering in states across the United States.

40.    DraftKings traditionally sought and obtained licenses from state gaming authorities and publicly represented that it complied with the complex state-by-state regulatory schemes governing sports betting.

41.    DraftKings first became licensed to operate a sportsbook in New Jersey in 2018, and presently operates a regulated sportsbook in 27 states and the District of Columbia.

42.    As a licensed sportsbook operator in multiple jurisdictions, DraftKings has long acknowledged that sports wagering may only be offered where expressly authorized by state law

---

[1] *See, e.g.,* Arizona (Kalshi); Connecticut (Kalshi, Robinhood, and Crypto.com); Illinois (Kalshi); Maryland (Kalshi and Crypto.com); Montana (Kalshi); Nevada (Kalshi, Robinhood, Coinbase Financial Markets, and Crypto.com); New Jersey (Kalshi and Robinhood); New York (Kalshi); Ohio (Kalshi); and Tennessee (Kalshi, Polymarket, and Crypto.com), each issuing cease-and-desist letters or comparable regulatory directives challenging sports event contracts offered through prediction market platforms.

and only through operators that obtain proper licensure from state regulators. In those jurisdictions where its sports wagering is permitted, DraftKings implements geolocation technology, identity verification procedures, and other safeguards designed to ensure compliance with state law.

43.    Despite this longstanding history of operating within state regulatory frameworks, DraftKings recently pivoted toward the emerging "prediction market" model.

44.    In doing so, in December 2025, DraftKings launched a new platform branded as "DraftKings Predictions," which purports to offer users the ability to trade contracts based on the outcomes of real-world events, including sporting contests.

45.    DraftKings Predictions now operates in all states where DraftKings is not authorized to operate a licensed sportsbook.

46.    In reliance on the trust and reputation it has built over years as a licensed and regulated sportsbook operator, DraftKings is actively soliciting users of its established platforms to participate in this new offering. DraftKings markets DraftKings Predictions directly to its existing customer base through in-app promotions and pop-up banners, such as the one shown below, appearing within its sportsbook interface.



47.     Through DraftKings Predictions, users may select outcomes of games and risk money on whether a certain team will win the game. If the predicted outcome occurs, the user receives a monetary payout; if the prediction proves incorrect, the user forfeits the funds used to purchase the contract. This is sports betting.

48.     This pivot represents a marked departure from DraftKings' prior approach to sports wagering. Rather than seeking licensure from state gaming authorities before offering such products, DraftKings instead attempts to structure its offerings in a manner designed to evade the regulatory frameworks governing sportsbooks.

**D.     DRAFTKINGS PREDICTIONS IS AN ILLEGAL UNLICENSED SPORTSBOOK.**

49.     The mechanics of DraftKings Predictions have every core feature of sports betting.

50.     The DraftKings Predictions app is designed to look and function nearly identical to

a traditional sportsbook. As shown below, the platform presents sporting events using the same visual layout, terminology, and wagering mechanics commonly found in competitive sports betting applications. Users are shown matchups between teams alongside familiar betting concepts such as spreads, totals, and payout odds, all displayed in a format that mirrors the betting boards used by sportsbooks.



51.     The platform further mirrors traditional sportsbook products by using the same sports-betting terminology and structure, such as references to the "spread" and other common wagering concepts, despite purporting to operate as a financial market. As such, the platform enables speculation on sporting outcomes in exchange for monetary gain or loss—the hallmark of sports wagering.



52.     Moreover, users of DraftKings Predictions are not simply trading with one another in a neutral marketplace. Instead, as with a traditional sportsbook, users ultimately wager against the platform itself or against liquidity providers operating within the market structure controlled by DraftKings. DraftKings sets the parameters of the market, determines how contracts are structured and resolved, and facilitates the payment of winnings and the collection of losses.

53.     In doing so, DraftKings performs the same role as a bookmaker: it operates the platform through which wagers are placed, maintains the system through which bets are recorded and resolved, and profits from the wagering activity conducted on its platform.

54.     Defendants' own contractual documents confirm that DraftKings Predictions is not the neutral, peer-to-peer marketplace that Defendants advertise. The Terms of Use disclose, in a section entitled "Market-Makers" buried more than a dozen pages into a thirty-five-page document, that market makers may "enter Commodity Transactions against or on the other side of your Commodity Transactions" and may "hold long or short positions in the same Commodity Transactions you engage in," that market makers "may have economic interests that are adverse

to yours," and—critically—that "affiliates of DraftKings Predictions may act as a Market Maker."

55.    The Terms of Use further disclose that DraftKings Predictions "may solicit a counterparty to trade opposite your Commodity Transaction or enter into transactions for its own account or the account of other counterparties that may, at times, be adverse to your interests," and that "that counterparty may make payments and/or pay a commission to DraftKings Predictions in connection with that transaction." DraftKings Predictions also acknowledges that it "may be in possession of information that, in the event known to you, might cause you to seek to dispose of or retain or increase your position," and that it "will be under no duty to make any such information available to you."

56.    Defendants profit from every transaction regardless of its outcome. Defendants charge transaction fees on each event contract, and they receive "discounts, rebates, payments, or other consideration from a DCM or other parties in exchange for routing a Commodity Transaction or in connection with a Commodity Transaction that the DCM or other parties trade against or permit others to trade against," which Defendants are "authorized to receive and retain" for their own account and "may do so without disclosing the amount received." Defendants further acknowledge that providing customers access to the relevant exchanges "may constitute the principal means for Draftkings Predictions to generate revenue," and that Defendants have "financial and other inducements to persuade you to trade."

57.    In June 2026, DraftKings announced that it had launched its own proprietary exchange for DraftKings Predictions contracts, further consolidating in DraftKings the roles of product designer, market operator, order router, fee collector, and—through its affiliates—liquidity provider on the other side of its customers' wagers. No licensed sportsbook could lawfully occupy those combined roles in an unlicensed state, and no legitimate derivatives intermediary would

advertise a matchup, a point spread, and payout odds in the visual language of a betting board.

58.    Defendants also do not disclose the true cost of a wager at the point a consumer decides to place it. Defendants display headline odds and payout figures in the same format used by sportsbooks, while the transaction fees that reduce a consumer's return are disclosed only "in the DraftKings Predictions App at the point of placement and with the Commodity Transaction confirmation." The effect is that consumers are induced to evaluate a wager on the basis of advertised odds that do not reflect the amount DraftKings will in fact extract from the transaction.

59.    Yet, unlike its licensed sportsbook operations, DraftKings Predictions has not obtained the licenses required by numerous state laws to offer sports wagering to residents within those jurisdictions. By offering contracts tied to sporting outcomes without complying with the regulatory frameworks governing sportsbooks, DraftKings Predictions operates outside the licensing regimes that states have established to regulate sports betting.

60.    The platform therefore functions as an illegal, unlicensed sportsbook operating under the label of a "prediction market." The terminology used by DraftKings does not alter the fundamental reality that users are placing wagers on sporting events through the platform.

E.    DRAFTKINGS DECEIVES CONSUMERS.

61.    DraftKings markets DraftKings Predictions to consumers as a legitimate "prediction market" platform rather than as a sports betting product. Through its branding, advertising, and user interface, DraftKings represents that users are merely "trading" or "predicting" outcomes of future events rather than placing wagers. These representations create the false impression that the platform is fundamentally different from traditional sports betting and operates under a separate regulatory framework.



62.     Users deposit real money, select outcomes of sporting events, and either win or lose money depending entirely on the result of those events. By describing these transactions as "predictions" or "event contracts," DraftKings obscures the true nature of the activity and misleads consumers into believing they are participating in a financial market rather than placing bets.

63.     DraftKings further misleads users through the design and presentation of the DraftKings Predictions platform itself. The platform closely resembles DraftKings' traditional sportsbook and is virtually indistinguishable from competitive sports betting applications, using similar layouts, graphics, terminology, and wagering-style interfaces. The platform prominently features familiar betting concepts, such as spreads, underdogs, and trade slips, presented in the same visual format commonly used by sportsbook operators. These graphics and user interface elements make the platform appear nearly identical to traditional sports betting apps, and bear little resemblance to the types of financial trading interfaces associated with legitimate derivatives or commodities markets.

64.     By designing DraftKings Predictions to visually mimic sportsbook wagering

platforms while simultaneously describing the activity as "prediction trading," DraftKings creates the misleading impression that users are engaging in lawful financial market activity when, in reality, they are participating in a product that mirrors sports betting.

65.    As illustrated below, the platform displays sporting events using the same betting mechanics found in conventional sportsbook apps, including point spreads, totals, and odds tied to specific scoring margins. For example, the market presents a matchup between the Dallas Mavericks and the Toronto Raptors alongside betting-style options such as "Mavericks Win by 8.5 points or more," accompanied by odds reflecting potential payouts. Users are then offered binary "Yes" or "No" selections tied to those outcomes, with corresponding payout odds displayed in sportsbook-style formatting.



66.    DraftKings' marketing also suggests that users are participating in a neutral marketplace in which participants trade contracts with one another. In practice, however, the

18

platform operates in a manner similar to a traditional sportsbook, where the platform controls the structure of the markets, sets the terms under which wagers are placed, and profits from the wagering activity occurring on the platform.

67.    By presenting DraftKings Predictions as a legitimate financial-style "prediction market" while simultaneously replicating the mechanics of sports betting, DraftKings conceals the true nature of the platform from consumers. These representations and omissions are likely to mislead reasonable users about the legality, structure, and risks associated with the platform.

68.    Prediction markets, like DraftKings Predictions, are also evidently vulnerable to insider trading and market manipulation.[2] DraftKings has implemented no safeguards to prevent it. Because DraftKings takes the other side of consumer positions and sets its own lines, consumers on DraftKings Predictions face the same exposure to informed insiders while DraftKings simultaneously profits from the trading volume regardless of outcome.[3]

69.    Sports gambling causes well-documented harm.[4] Around 50% of individuals seeking help for gambling disorder have suicidal ideation, and about 17% have attempted suicide.[5] When considering all addictions, gambling addiction has the highest suicide attempt and completion rate, two times greater than those addicted to drugs and alcohol.[6] It is further estimated that 5% of all suicides are gambling related on some level. This is in stark contrast to the 0.6% of

---

[2] Melissa De Witte, *Prediction markets are surging – here's what you need to know*, (April 28, 2026), https://news.stanford.edu/stories/2026/04/prediction-markets-facts-gambling-regulation. (Last accessed July 31, 2026).

[3] *Id*.

[4] Brian Pempus, *Gambling And Suicide: The Latest Research On Risks* (Jan. 30, 2026), https://gamblingharm.org/gambling-suicide-research-risk/. (Last accessed July 30, 2026).

[5] Birches Health, *The Relationship Between Problem Gambling and Suicide* (Apr. 30, 2024), https://bircheshealth.com/resources/gambling-suicide. (Last accessed July 31, 2026).

[6] *Id*.

the population that attempts suicide yearly.[7]

70.   Notwithstanding these risks, DraftKings has not extended to DraftKings Predictions the responsible-gaming safeguards it provides on its licensed sportsbook, including gambling addiction hotline information, session time data, and betting history visualizations, leaving Plaintiffs and the Class exposed to the very harms that licensing and responsible-gaming requirements are designed to prevent.

71.   Defendants' own Terms of Use confirm the absence of these protections. Defendants state only that they "may permit" customers to set responsible use limits and to self-exclude, and they expressly disclaim any legal obligation to do so: "DraftKings Predictions is not required by law or regulation to provide these Responsible Trading tools and does not assume any obligation by offering them." By contrast, an operator licensed under the Massachusetts Sports Wagering Law must implement responsible gambling features, report suspected illegal activity, bar wagering by persons connected to the events wagered upon, verify age and identity electronically, offer wagering limits, and honor the Commonwealth's voluntary self-exclusion program. See G.L. c. 23N, §§ 4(d)(2), 11, 13(d); 205 Code Mass. Regs. §§ 248.16, 256.07.

72.   Defendants also permit users to trade at eighteen years of age, rather than the twenty-one-year minimum applicable to licensed sports wagering in Massachusetts and many other jurisdictions, and they condition eligibility on the customer's own representation that he is "at least eighteen (18) years of age." Defendants thereby extend an unregulated sports wagering product to a population that state legislatures have determined should be excluded from it altogether.

73.   As a result of DraftKings' deceptive marketing and representations, consumers are

_____

[7] *Id.*

20

induced to deposit funds and engage in wagering activity on DraftKings Predictions under the mistaken belief that they are participating in a lawful and properly regulated platform distinct from traditional sports betting.

74. Defendants knew that their conduct was unlawful, or at a minimum knew that its legality was contested, and they proceeded anyway while withholding that knowledge from consumers. In the Event Contracts Risk Disclosure that Defendants incorporate into the Terms of Use, Defendants acknowledge that there is "active and evolving litigation and regulatory activity concerning whether and under what conditions event contracts may be listed, cleared, offered, or traded under the federal commodities laws and regulations, and whether such activity is permissible without regard to state gaming and wagering laws," that courts, regulators, and legislatures "have not reached uniform or final resolutions" on those questions, and that potential outcomes include "the suspension or delisting of certain event contracts," "prohibitions or geographic restrictions," "requirements to satisfy state-level licensing," and "retroactive or prospective changes to contract validity," such that contracts "could also be voided or settled without your consent at a non-market price."

75. The Terms of Use likewise contemplate that state authorities would demand that Defendants stop: Defendants reserved the right to liquidate positions, terminate app access, and close accounts "in the event that an instrumentality of a State issues a demand to cease allowing customers to engage in Commodity Transactions." Defendants thus built the anticipated illegality of their product into their consumer contract, while simultaneously marketing the product to consumers as lawful "trading."

76. Rather than disclose these risks in the plain terms a consumer would understand, Defendants disclaimed all responsibility for the legality of the very product they sold. The Terms

21

of Use state, in capital letters, that "THE DRAFTKINGS RELEASED PARTIES DO NOT WARRANT THAT YOUR CREATION OF YOUR DRAFTKINGS PREDICTIONS ACCOUNT, YOUR USE OF THE SERVICES, OR ANY COMMODITY TRANSACTION IS LAWFUL IN ANY PARTICULAR JURISDICTION," and they require the consumer to "REPRESENT AND WARRANT THAT YOUR ACTIVITIES ARE LAWFUL IN EVERY JURISDICTION WHERE YOU CREATE YOUR DRAFTKINGS PREDICTIONS ACCOUNT OR USE THE SERVICES." Defendants also state that they are "not responsible for your compliance with Applicable Law." A company that publicly markets a product as a lawful alternative to sports betting, while privately shifting the entire risk of illegality onto its customers, engages in precisely the kind of unfair and deceptive practice that consumer protection statutes forbid.

## F.    STATES, INCLUDING MASSACHUSETTS, ARE TAKING ACTION AGAINST PREDICTION MARKET SPORTSBOOKS.

77.    As prediction market platforms have expanded into sports-related contracts, state gaming authorities and attorneys general have increasingly scrutinized platforms that allow users to speculate on the outcomes of sporting events through so-called "event contracts," concluding that such products may constitute unlicensed sports wagering.

78.    As the marketplace pioneer, Kalshi's efforts to skirt state gambling laws have repeatedly fallen short, prompting a wave of litigation and regulatory enforcement actions across the country. The company has faced consumer lawsuits in Alabama, California, Illinois, New York, and Oregon, as well as enforcement actions brought by state regulators in Connecticut, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New York, Ohio, Tennessee, and Utah.

79.    The Massachusetts Attorney General has filed suit against Kalshi alleging that its "uninterrupted sequence of feedback and engagement contributes to a reward loop commonly associated with addictive gambling behavior. Behavioral researchers warn that such mechanisms,

modeled after operant conditioning and slot machine dynamics, can bypass rational evaluation and contribute to excessive financial risk-taking." *See* Complaint ¶ 72, *Commonwealth v. KalshiEX LLC*, *No.* 2584CV02525 *(Mass. Super. Ct.* Suffolk Cnty. *filed* Sept. 12, *2025).* The Commonwealth contends that Kalshi's sports-related event contracts function as wagers on sporting events and therefore fall within the regulatory authority of the Commonwealth's gambling laws, and that Kalshi's sporting event contracts constitute sports wagering as defined by G.L. c. 23N, § 3. *Id.* ¶¶ 158-161.

80.    On February 6, 2026, the Suffolk Superior Court entered the preliminary injunction, enjoining that designated contract market from "[o]ffering, listing, matching, executing, settling, or otherwise facilitating any contract" on "sporting events" for "any person located in Massachusetts." The court rejected as "overly broad" the argument that the Commodity Exchange Act displaces "traditional state police powers, such as gambling regulation."

81.    The Massachusetts Gaming Commission has also addressed prediction markets directly. On November 13, 2025, the Commission wrote to all Massachusetts sports wagering licensees—including DraftKings—stating that licensees are "prohibited from offering sports-related event contracts in Massachusetts, directly or via an affiliate, related business entity, or other association, or directing patrons to such event contracts being offered in Massachusetts," warning that the Commission "may take steps up to and including revocation of your license," and requiring a written response within ten business days identifying the steps the licensee would take to comply.

82.    Other jurisdictions have taken similar steps. State gaming regulators across the country have issued cease-and-desist letters, regulatory notices, and enforcement actions against prediction market platforms offering sports-related contracts. These actions reflect a growing consensus among regulators that companies cannot evade state gambling laws merely by

describing wagers as "predictions," "contracts," or "market positions."

83.     The most recent example of state regulators pushing back against sports-based prediction markets comes from Nevada.  On March 4, 2026, The Nevada Gaming Control Board ("NGCB") issued a cease-and-desist order to Kalshi, stating that offering "event-based contracts" tied to sporting events and elections "is unlawful in Nevada, unless and until approved as licensed gaming by the Nevada Gaming Commission."[8] The NGCB further warned that the conduct violates Nevada gaming laws and may result in criminal liability.

84.     This action reflects a growing recognition among state regulators that so-called "event contracts" tied to sporting outcomes are, in substance, wagers on real-world events. As states evaluate whether these offerings constitute unlawful gambling within their jurisdictions, additional enforcement actions and litigation are likely to follow.

85.     Defendants' conduct fits squarely within this emerging regulatory concern. Like the platforms already facing scrutiny, Defendants seek to repackage wagers on sporting outcomes as "prediction contracts" while operating outside the established state regulatory frameworks that govern lawful sports wagering. As regulators and courts continue to address these schemes, platforms such as DraftKings Predictions will face the same legal challenges and scrutiny now emerging across the country.

**G.     DRAFTKINGS' OWN STATEMENTS AND CONDUCT CONFIRM THAT DRAFTKINGS PREDICTIONS IS AN UNLICENSED SPORTSBOOK.**

86.     DraftKings' own public statements confirm that DraftKings Predictions is a rebranded, unlicensed sportsbook designed to reach consumers in states where DraftKings is not licensed to operate a regulated sportsbook. DraftKings' Chief Executive Officer, Jason Robins, has

---

[8] https://www.gaming.nv.gov/siteassets/content/about/press-release/NGCB_-_News_Release_-_KalshiEX_Cease_and_Desist_Order__3-4-2025.pdf (last accessed: July 31, 2026).

acknowledged that "customers don't really even understand the difference" between wagering on DraftKings' licensed sportsbook and wagering on DraftKings Predictions.

87. DraftKings exploits this consumer confusion to its advantage. CEO Robins has stated that the inability of customers to distinguish between DraftKings' licensed sportsbook and DraftKings Predictions is "actually a huge advantage," because DraftKings can drive a single national marketing message across both products and thereby acquire new customers in states where its licensed sportsbook cannot legally operate.[9]

88. DraftKings has openly acknowledged that it deliberately targets DraftKings Predictions at states that prohibit online sports betting because, in CEO Robins' words, there is not "much financial opportunity in places where we already have online sports betting," and that pursuing those already-licensed markets would only "upset regulators that we have great relationships with."[10] By DraftKings' own account, its prediction customers in these states "look a lot like" its existing licensed sportsbook customers.

89. This strategy has been enormously profitable for DraftKings and correspondingly harmful to consumers. DraftKings has reported approximately $3.4 billion in annualized consumer volume and approximately $11.3 billion in annualized total trading volume on DraftKings Predictions, of which an estimated 66 percent is attributable to sports offerings, and nearly 70 percent of that sports volume comes from states where online sports betting is illegal.[11]

[9] DraftKings Inc., DraftKings Q1 2026 Earnings Presentation, at 3 (May 7, 2026) https://s21.q4cdn.com/869500724/files/doc_earnings/2026/q1/presentation/Q1-26-Presentation.pdf (Last accessed: July 31, 2026).

[10] Jason Robins, *Prediction Markets Are a Gamble, iCasino on Upswing, and More, InGame* (Nov. 7, 2025) https://www.ingame.com/jason-robins-draftkings-interview/ (Last accessed July 31, 2026).

[11] *DraftKings Launches Proprietary Exchange to Bolster Differentiated Predictions Experience, DraftKings* (June 26, 2026),https://ir.aboutdraftkings.com/news/news-details/2026/DraftKings-Launches-Proprietary-Exchange-to-Bolster-Differentiated-Predictions-Experience/default.aspx;

**H.    THE SPORTS INDUSTRY TREATS PREDICTION MARKETS AS SPORTS BETTING.**

90.    Major professional sports leagues and the NCAA likewise treat prediction markets as sports betting, not as lawful financial trading, and bar their own participants from using them.[12] Major League Baseball has sent a memo to its players prohibiting engagement with baseball event contracts, framing such participation as a violation of its sports betting policies.[13] The National Football League has stated that it views prediction markets the same way it views traditional sports betting and does not permit players or league personnel to use them.[14]

91.    The National Basketball Association similarly prohibits its players from wagering on prediction markets and has warned regulators that prediction markets are not required to report suspicious trades or cooperate with league integrity investigations. In a letter to the CFTC earlier this year, the National Basketball Association stated, "[W]e believe that [prediction] markets raise integrity concerns that are similar to those associated with sports betting. It is the NBA's view that sports prediction markets should be subject to robust and comprehensive regulations that are specifically designed to protect the integrity of sports leagues and their competitions."[15]

---

*What Is DKeX? Inside DraftKings' Move to Own Its Prediction Market*, BettingPros (June 29, 2026) https://www.bettingpros.com/articles/what-is-dkex-inside-draftkings-move-to-own-its-prediction-market/. (Last accessed July 31, 2026).

[12] Bradford Williams Davis, *MLB Sent Memo Warning Players About Prediction Markets* (Dec. 5, 2025), https://www.msn.com/en-us/sports/baseball/mlb-sent-memo-warning-players-about-prediction-markets/ar-AA1RO6MK. (Last accessed July 31, 2026).

[13] *Id*.

[14] David Purdum, *NFL says gambling policy covers prediction markets* (April 25, 2025), https://www.espn.com/espn/betting/story/_/id/46073608/nfl-says-gambling-policy-covers-prediction-markets. (Last accessed July 31, 2026).

[15] National Basketball Association letter to Commodity Futures Trading Commission (April 30, 2026), https://resources.sbcamericas.com/sbcamericas/2026/05/NBA-CFTC-Letter.pdf (Last accessed July 31, 2026).

26

92.     NCAA President Charlie Baker has likewise stated that the NCAA "vehemently opposes college sports prediction markets," warning that they expose student-athletes to increased harassment, threaten competitive integrity and recruiting, and allow wagering on athletes' careers outside the safeguards required of licensed sportsbooks.[16]

### PLAINTIFFS' ALLEGATIONS

93.     Plaintiff Gordon signed up for and began using the DraftKings Predictions platform around December 2025, after seeing DraftKings' in-app promotions for Predictions within the DraftKings sportsbook application. Mr. Gordon deposited funds and placed several dozen wagers on sporting events, ranging from $6.44 to $680.86 per wager, including wagers on the outcomes of professional basketball and football games. Mr. Gordon understood from DraftKings' marketing, branding, and the design of the platform that he was participating in a lawful, regulated product, and he did not understand that DraftKings or its affiliates could take the other side of his positions or that the advertised odds did not account for DraftKings' transaction fees. As a result of DraftKings' deceptive and unlawful conduct, Mr. Gordon lost over $700, in addition to the transaction fees DraftKings extracted from his wagers.

94.     Plaintiff Arie Weissmann signed up for and began using the DraftKings Predictions platform around January 2026, after seeing DraftKings' marketing of Predictions to its existing customers. Mr. Weissmann deposited funds and placed several dozen wagers on the outcomes of sporting events. Like Mr. Gordon, he believed he was using a lawful, regulated DraftKings product and was unaware that DraftKings or its affiliates could take the other side of his positions or that DraftKings' advertised odds excluded its transaction fees; had those facts been disclosed, he would

---

[16] David Purdum, *Prediction market Kalshi self-certifies transfer portal trading,* (Dec. 17, 2025), https://www.espn.com/college-football/story/_/id/47341610/prediction-market-kalshi-intends-offer-trading-portal. (Last accessed July 31, 2026).

not have wagered. Within a matter of weeks, his gambling on the platform escalated to the point that, after losing more than $1,000, he felt he had no meaningful option but to enroll in DraftKings' self-exclusion program on March 9, 2026, barring himself from accessing or wagering on the platform to prevent further losses.

95.    Plaintiff Johnny Harris signed up for the DraftKings Predictions platform around March 2026 and used the platform to place several dozen wagers on sporting events, generally ranging from $5 to $20 per wager. Mr. Harris likewise believed, based on DraftKings' representations and the sportsbook-style presentation of the platform, that he was using a lawful product in which he traded against other users rather than against DraftKings and its affiliates. Mr. Harris deposited funds and ultimately lost over $100, plus transaction fees.

96.    Each Plaintiff placed his wagers through the DraftKings Predictions application, funded his account with his own money, and lost that money to Defendants on the outcomes of sporting events. Neither Plaintiffs nor, on information and belief, any Class member received any of the disclosures, protections, or remedies that state law guarantees to customers of licensed sports wagering operators. Plaintiffs and the Class members did not know, and in the exercise of reasonable diligence could not have known, that Defendants were operating an unlicensed sports wagering business, that Defendants' affiliates could take positions adverse to theirs, or that Defendants collected undisclosed rebates and fees on their transactions.

97.    On April 29, 2026, more than thirty days before the filing of this action, Plaintiffs, through their counsel, mailed and delivered to Defendants a written demand for relief pursuant to G.L. c. 93A, § 9(3) (the "Demand Letter"). The Demand Letter was addressed and delivered to DraftKings at its Boston, Massachusetts headquarters, which is the place of business of both Defendants and the place where Defendants maintain assets.

98.     The Demand Letter reasonably described the unfair and deceptive acts and practices relied upon. It stated that DraftKings was "operating an unlawful sports betting operation in Massachusetts under the guise of a lawful 'prediction market,'" because DraftKings Predictions permits consumers to "wager on the outcomes of sporting events" while DraftKings "falsely represent[s] that users are merely 'trading' or 'predicting' outcomes of future events rather than placing wagers"; that DraftKings offered sports-related event contracts without the license required by Massachusetts law; and that DraftKings displayed "headline odds pricing" that did not include the applicable transaction fees, which were disclosed only at checkout. Defendants' written response confirms that they understood each of these theories, addressing them point by point.

99.     The Demand Letter also described the injuries suffered and the relief sought. It described the monetary losses Plaintiffs and similarly situated consumers sustained by wagering on an unlicensed platform, the transaction fees they paid that were not reflected in the advertised odds, and the loss of the consumer protections that licensed operators must provide, and it demanded an accounting and refunds of amounts lost by Plaintiffs and similarly situated customers. The Demand Letter thereby provided Defendants with sufficient detail to permit them reasonably to ascertain their exposure and to evaluate whether to tender a settlement.

100.    Defendants received the Demand Letter and responded in writing on May 29, 2026. Defendants did not tender any settlement.

101.    Because Defendants made no written tender of settlement within thirty days of the Demand Letter, they may not limit Plaintiffs' recovery under the second paragraph of G.L. c. 93A, § 9(3).

102.    More than thirty days elapsed between the delivery of the Demand Letter on April 29, 2026 and the filing of this action, and all statutory prerequisites to Plaintiffs' claim under G.L.

c. 93A, § 9 have been satisfied.

## CLASS ALLEGATIONS

103.    **Class Definition.** Pursuant to the provisions of Fed. R. Civ. P. 23(a), 23(b)(2), and

(b)(3), Plaintiffs bring this action on behalf of themselves, a Multi-State Class defined as follows:

> All persons in Alabama, Alaska, California, Florida, Georgia, Hawaii, Idaho, Nebraska, New Mexico, North Dakota, Oklahoma, Rhode Island, South Carolina, South Dakota, Texas, and Utah who spent money by purchasing sports-related event contracts (i.e., wagering) on the DraftKings Predictions mobile or web platforms.

104.    In addition and/or alternatively to the Multi-State Class, and pursuant to Fed. R.

Civ. P. 23(c)(5), Plaintiffs bring this action on behalf of the following State Classes or subclasses

as well as any subclasses or issue classes as Plaintiffs may propose and/or the Court may designate

at the time of class certification:

**Alabama Class**: All persons in Alabama who spent money by wagering on DraftKings

Prediction's mobile or web platforms.

**Alaska Class**: All persons in Alaska who spent money by wagering on DraftKings

Prediction's mobile or web platforms.

**California Class**: All persons in California who spent money by wagering on DraftKings

Prediction's mobile or web platforms.

**Florida Class**: All persons in Florida who spent money by wagering on DraftKings

Prediction's mobile or web platforms.

**Georgia Class**: All persons in Georgia who spent money by wagering on DraftKings

Prediction's mobile or web platforms.

**Hawaii Class**: All persons in Hawaii who spent money by wagering on DraftKings

Prediction's mobile or web platforms.

**Idaho Class**: All persons in Idaho who spent money by wagering on DraftKings Prediction's mobile or web platforms.

**Nebraska Class**: All persons in Nebraska who spent money by wagering on DraftKings Prediction's mobile or web platforms.

**New Mexico Class**: All persons in New Mexico who spent money by wagering on DraftKings Prediction's mobile or web platforms.

**North Dakota Class**: All persons in North Dakota who spent money by wagering on DraftKings Prediction's mobile or web platforms.

**Oklahoma Class**: All persons in Oklahoma who spent money by wagering on DraftKings Prediction's mobile or web platforms.

**Rhode Island Class**: All persons in Rhode Island who spent money by wagering on DraftKings Prediction's mobile or web platforms.

**South Carolina Class**: All persons in South Carolina who spent money by wagering on DraftKings Prediction's mobile or web platforms.

**South Dakota Class**: All persons in South Dakota who spent money by wagering on DraftKings Prediction's mobile or web platforms.

**Texas Class**: All persons in Texas who spent money by wagering on DraftKings Prediction's mobile or web platforms.

**Utah Class**: All persons in Utah who spent money by wagering on DraftKings Prediction's mobile or web platforms.

105.    The Multi-State Class and the State Classes are collectively referred to herein as the "Class."

106.    Excluded from the Class are: (1) any Judge or Magistrate presiding over this action

31

and members of their families; (2) Defendants, their subsidiaries, parents, successors, predecessors, and any entity in which Defendants have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

107.    **Numerosity.** Upon information and belief, there are thousands of Class members, so joinder of all members is impracticable. The precise number of class members and their identities are unknown to Plaintiffs currently but may be ascertained from Defendants' business records and other third-party sources.

108.    **Ascertainability.** The Class is readily ascertainable from Defendants' own records. Defendants require each customer to provide his full legal name, date of birth, social security number or other tax identification number, and physical address, they verify identity and eligibility, and they monitor and record customers' geographic location information. Defendants therefore possess the data necessary to identify each Class member, the states in which each Class member transacted, the amounts each Class member deposited and wagered, the fees each Class member paid, and the amounts each Class member lost.

109.    **Commonality and Predominance.** There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

   a.    Whether the DraftKings Predictions sports markets are unlawful;

b.  Whether Plaintiffs and each member of the Class lost money or other things of value on DraftKings Predictions;

c.  Whether Defendants' conduct was unlawful, unfair, fraudulent, deceptive, and/or misleading under applicable law;

d.  Whether Plaintiffs and the Class sustained damages, and if so, the proper measure of those damages;

e.  Whether Defendants have been unjustly enriched as a result of its conduct;

f.  Whether the DraftKings Predictions Terms of Use require the application of Massachusetts substantive law to the claims of Plaintiffs and the Class;

g.  Whether Defendants' operation of DraftKings Predictions without a sports wagering license constitutes an unfair or deceptive act or practice under G.L. c. 93A, § 2;

h.  Whether Defendants, directly or through their affiliates, take positions adverse to their customers and profit from customer wagers regardless of outcome, and whether Defendants disclosed those facts;

i.  Whether Defendants' conduct was willful and knowing, and whether Defendants' refusal to grant relief in response to Plaintiffs' demand was made in bad faith, entitling Plaintiffs and the Class to multiple damages; and

j.  Whether the release, disclaimer, limitation-of-liability, contractual limitations-period, and remedy-waiver provisions of the Terms of Use are enforceable against the statutory claims asserted herein.

110.  **Typicality**. Plaintiffs' claims are typical of the claims of the Class because they were users who made wagers on DraftKings Predictions as a result of Defendants' unlawful and

33

wrongful conduct. The factual and legal basis of Defendants' liability to Plaintiffs and to the other Class members are the same, resulting in injury to Plaintiffs and to all the other members of the Class. Plaintiffs and the other members of the Class have suffered harm and damages due to Defendants' unlawful and wrongful conduct.

111.    **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Class.

112.    **Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication. The damages or other financial detriment suffered by Plaintiffs and putative class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the proposed Class to individually seek redress for Defendants' wrongful conduct.

113.    **Final Declaratory or Injunctive Relief.** Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

## CLAIMS FOR RELIEF

**A.      CLAIMS ASSERTED ON BEHALF OF THE MULTI-STATE CLASS.**

<u>**MULTI-STATE COUNT I**</u>

**VIOLATIONS OF MASSACHUSETTS GENERAL LAWS – GAMING**

**Mass. Gen. Laws ch. 137, § 1**

**(Multistate Class Against All Defendants)**

114.    Plaintiffs repeat, reallege, and incorporate all foregoing and subsequent paragraphs as if fully set forth herein.

115.    Mass. Gen. Laws ch. 137, § 1 provides as follows:

Whoever, by playing at cards, dice or other game, or by betting on the sides or hands of those gaming, except for gaming conducted in licensed gaming establishments pursuant to chapter 23K or sports wagering conducted pursuant to chapter 23N, loses to a person so playing or betting money or goods, and pays or delivers the same or any part thereof to the winner, or whoever pays or delivers money or other thing of value to another person for or in consideration of a lottery, policy or pool ticket, certificate, check or slip, or for or in consideration of a chance of drawing or obtaining any money, prize or other thing of value in a lottery or policy game, pool or combination, or other bet, may recover such money or the value of such goods in contract; and if he does not within three months after such loss, payment or delivery, without covin or collusion, prosecute such action with effect, any other person may sue for and recover in tort treble the value thereof.

116.    Plaintiffs and the Class deposited and paid money into accounts opened through,

and controlled by, Defendants' platform for the purpose of engaging in unlawful betting and wagering on the outcomes of sporting events, and they lost that money on those wagers. Each wager was a "bet" within the meaning of G.L. c. 137, § 1: the consumer risked a sum of money on an uncertain occurrence—the outcome of a sporting event or of a participant's performance in it—in exchange for the prospect of a fixed payout, with chance predominating over skill because no consumer can influence the result of the game.

117. Defendants were engaged in an unlawful betting and wagering enterprise in which Plaintiffs and the Class paid to participate. Defendants' gaming falls within no exception to G.L. c. 137, § 1: it is not "gaming conducted in licensed gaming establishments pursuant to chapter 23K," and it is not "sports wagering conducted pursuant to chapter 23N," because neither Defendant holds a license from the Massachusetts Gaming Commission to offer sports wagering through DraftKings Predictions and neither has complied with Chapter 23N or the regulations promulgated under it.

118. Defendants are the "winner" of the money Plaintiffs and the Class lost, and in the alternative are the persons to whom Plaintiffs and the Class paid or delivered money "in consideration of . . . [a] bet" within the meaning of G.L. c. 137, § 1. Defendants set the terms and parameters of each market, determine which contracts are offered and how they are resolved, control the flow of funds into and out of customer accounts, collect a transaction fee on every wager, receive undisclosed rebates and payments from exchanges and counterparties in connection with customers' wagers, and, through their affiliated market makers, take positions on the opposite side of their customers' wagers and retain the proceeds when their customers lose.

119. Massachusetts law governs this claim. Defendants operated their unlawful enterprise from Massachusetts, and Defendants' own Terms of Use provide that the parties'

agreements "shall be governed by the internal substantive laws of the Commonwealth of Massachusetts, without respect to its conflict of laws principles or any other law or regulation that would permit or require the application of the substantive laws of any jurisdiction other than the Commonwealth of Massachusetts," and designate Boston, Massachusetts as the exclusive forum for all claims arising out of or relating to customers' accounts and use of the services.

120.    Defendants' unlawful enterprise also violates the gambling and gaming statutes of the other states in which Class members reside and Defendants operate DraftKings Predictions without a license, including: Alabama (Ala. Code §§ 13A-12-20 to 13A-12-31); Alaska (Alaska Stat. §§ 11.66.200–11.66.280); California (Cal. Penal Code §§ 330, 337a, 337j; Cal. Bus. & Prof. Code § 19801 et seq.); Florida (Fla. Stat. §§ 849.01–849.42); Georgia (Ga. Code Ann. §§ 16-12-20 to 16-12-37); Hawaii (Haw. Rev. Stat. §§ 712-1220 to 712-1231); Idaho (Idaho Code §§ 18-3801 to 18-3810); Nebraska (Neb. Rev. Stat. §§ 28-1101 to 28-1117); New Mexico (N.M. Stat. Ann. §§ 30-19-1 to 30-19-16); North Dakota (N.D. Cent. Code §§ 12.1-28-01 to 12.1-28-04); Oklahoma (Okla. Stat. tit. 21, §§ 941–969); Rhode Island (R.I. Gen. Laws §§ 11-19-1 to 11-19-32); South Carolina (S.C. Code Ann. §§ 16-19-10 to 16-19-140); South Dakota (S.D. Codified Laws §§ 22-25-1 to 22-25-46); Texas (Tex. Penal Code §§ 47.01–47.06); and Utah (Utah Code Ann. §§ 76-10-1101 to 76-10-1108), each of which prohibits unlicensed gambling and related conduct of the type Defendants engage in through DraftKings Predictions.

121.    Pursuant to Mass. Gen. Laws ch. 137, § 1, Plaintiffs and the Class are entitled to recover in contract from Defendants the money they lost, paid, or delivered as part of Defendants' unlawful betting and wagering enterprise, together with interest and costs.

122.    In the alternative, and as to all losses that were sustained more than three months before the filing of this action and that the losing bettors have not, within three months after such

37

loss, payment, or delivery, and without covin or collusion, prosecuted to effect, Plaintiffs sue as "any other person" under the second clause of G.L. c. 137, § 1 and are entitled to recover in tort treble the value of those losses. On information and belief, the overwhelming majority of DraftKings Predictions customers who lost money on sports-related event contracts have never brought any action to recover those losses.

123.    Plaintiffs Gordon, Weissmann, and Harris each lost more than the statutory minimum, and each lost money on wagers placed within the applicable limitations period. Plaintiffs bring this claim on behalf of themselves and every Class member who lost money to Defendants on sports-related event contracts, and they seek an accounting from Defendants of all amounts deposited, wagered, lost, and retained in connection with those contracts.

## MULTI-STATE COUNT II
## VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECTION ACT
### Mass. Gen. Laws Ch. 93A
### (Multistate Class Against All Defendants)

124.    Plaintiffs repeat, reallege, and incorporate all foregoing and subsequent paragraphs as if fully set forth herein.

125.    Mass. Gen. Laws ch. 93A, § 2(a) prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." "Trade" and "commerce" include "the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property" and "any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth." G.L. c. 93A, § 1(b). Plaintiffs and the Class are "persons" entitled to bring suit under § 9(1), and they bring this claim on behalf of themselves and all other similarly injured and situated persons as § 9(2) permits.

126.    Defendants, from their headquarters in Boston, Massachusetts, designed, priced, marketed, and operate an unlawful sports wagering business under the guise of a lawful "prediction market," and they did so in the conduct of trade or commerce that directly and indirectly affects the people of the Commonwealth. Defendants are licensed by the Massachusetts Gaming Commission to offer sports wagering in Massachusetts, they market their suite of gambling products to Massachusetts consumers, they employ personnel in Massachusetts, they collect the revenues of the DraftKings Predictions business in Massachusetts, and they imposed Massachusetts law on every customer of that business by contract.

127.    Through DraftKings Predictions, Defendants offer consumers in states where DraftKings is not licensed to operate a legal sportsbook the ability to wager on the outcomes of sporting events—the hallmark of sports betting—while falsely representing that users are merely "trading" or "predicting" outcomes of future events rather than placing wagers.

128.    The Massachusetts Sports Wagering Law, G.L. c. 23N, § 5(a), provides that "[n]o person shall engage in sports wagering in the commonwealth except as provided in this chapter," and defines "sports wagering" as "the business of accepting wagers on sporting events" and "wager" as "a sum of money or thing of value risked on an uncertain occurrence." G.L. c. 23N, § 3. DraftKings Predictions accepts such wagers without having obtained the required license.

129.    The Massachusetts Superior Court has already held that sports-related event contracts constitute "sports wagering" under G.L. c. 23N and that a prediction market offering them without a license may be enjoined. *See Commonwealth v. KalshiEX, LLC*, No. 2584CV02525 (Mass. Super. Ct. Suffolk Cnty. Jan. 20, 2026) (allowing the Commonwealth's motion for a preliminary injunction and denying the defendant's motion to dismiss on federal preemption grounds, and rejecting as "overly broad" the contention that the Commodity Exchange Act's

exclusive jurisdiction provision displaces "traditional state police powers, such as gambling regulation"). The same reasoning applies with equal force to DraftKings Predictions. Defendants' operation of DraftKings Predictions without a sports wagering license violates G.L. c. 23N, § 5(a), a statute enacted for the protection of the public's health, safety, and welfare, and that violation is unfair and deceptive within the meaning of G.L. c. 93A, § 2 and 940 Code Mass. Regs. § 3.16(3). *See Klairmont v. Gainsboro Rest., Inc.*, 465 Mass. 165, 174-177 (2013) (violation of a statute or regulation intended to protect the public's health, safety, or welfare supports Chapter 93A liability where the conduct leading up to the violation is itself unfair or deceptive, as where a defendant knowingly operates without required permits while aware of the risks created by its noncompliance).

130.   Independent of any statutory violation, Defendants' conduct was unfair within the meaning of G.L. c. 93A, § 2. It falls within the penumbra of established statutory and common-law concepts of unfairness embodied in the Commonwealth's gaming statutes; it is immoral, unethical, oppressive, and unscrupulous, in that Defendants deliberately marketed an addictive gambling product to consumers in states that have outlawed it, stripped of every consumer safeguard the licensed product carries; and it caused substantial injury to consumers that they could not reasonably have avoided and that is not outweighed by any countervailing benefit. Defendants' own executives described consumers' inability to distinguish the unlicensed product from the licensed one as "actually a huge advantage."

131.   Defendants' conduct was also deceptive within the meaning of G.L. c. 93A, § 2 and 940 Code Mass. Regs. § 3.16(2), because Defendants made affirmative representations and material omissions that had the capacity to mislead reasonable consumers acting reasonably under the circumstances. Defendants represented that users were "trading" or "predicting" rather than

wagering; presented a betting board with matchups, spreads, totals, and payout odds indistinguishable from their licensed sportsbook; conveyed that consumers traded with one another in a neutral marketplace; and advertised headline odds that omitted the transaction fees Defendants extract. Defendants simultaneously failed to disclose material facts, including that DraftKings Predictions is not licensed to offer sports wagering in the states where it operates, that the legality of the product under state gaming law is contested and was known by Defendants to be contested, that Defendants' affiliates may take positions adverse to their customers, that Defendants receive undisclosed rebates and payments in connection with customer wagers, and that none of the responsible-gaming protections required of licensed operators applies.

132.    Defendants' unfair and deceptive conduct caused Plaintiffs and the Class separate, identifiable, and quantifiable harm. Plaintiffs and the Class (a) lost the money they deposited and wagered on an illegal and unenforceable gambling product they would not have used had the truth been disclosed; (b) paid transaction fees that were not reflected in the odds Defendants advertised at the moment of decision; (c) paid effective prices that were inflated by the margin Defendants and their affiliated market makers built into both sides of each transaction; and (d) were deprived of the protections that state law requires licensed sports wagering operators to provide, including responsible-gaming tools, deposit and time limits, statutory self-exclusion, integrity monitoring, age verification at twenty-one, segregation of customer funds, and reserve requirements securing payouts. Each of these injuries is a loss of money or property within the meaning of G.L. c. 93A, § 9(1), and each is causally traceable to the conduct alleged.

133.    Plaintiffs satisfied the demand requirement of Mass. Gen. Laws ch. 93A, § 9(3). As alleged above, on April 29, 2026—more than thirty days before this action was filed—Plaintiffs, through counsel, mailed and delivered to Defendants at their Boston headquarters a written

41

demand for relief that identified each claimant by name, stated that relief was sought on behalf of the claimants and all other similarly situated customers, reasonably described the unfair and deceptive acts and practices relied upon and the injuries suffered, and demanded an accounting and refunds. Defendants responded in writing on May 29, 2026, denying all liability, disputing that Chapter 93A applies, and expressly declining to tender any settlement amount. Defendants made no written tender of settlement within thirty days of the demand, and they have not changed the conduct complained of.

134. Defendants' conduct has been willful and knowing. Defendants are sophisticated entities with full knowledge of state gambling laws and the licensure requirements applicable to sports wagering, and have long acknowledged that sports wagering may only be offered where expressly authorized by state law and only through operators that obtain proper licensure.

135. Despite this knowledge, Defendants deliberately chose to offer sports wagering through DraftKings Predictions without obtaining the required license, in an attempt to evade state regulatory frameworks, and they concealed the true nature and legal status of the product from consumers. Defendants' violations were therefore willful and knowing, and Defendants' refusal to grant relief in response to Plaintiffs' demand was made in bad faith with knowledge or reason to know that the acts and practices complained of violated G.L. c. 93A, § 2. Either predicate requires an award of not less than two and up to three times actual damages under M.G.L. c. 93A, § 9(3).

136. Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiffs and the Class are entitled to recover their actual damages or statutory damages of twenty-five dollars per Class member, whichever is greater, multiple damages of not less than two and up to three times actual damages for Defendants' willful and knowing violations and bad-faith refusal of relief, reasonable attorneys' fees and costs under § 9(4), and injunctive and other equitable relief.

**MULTI-STATE COUNT III**

**UNJUST ENRICHMENT**

**(Multistate Class Against All Defendants)**

137.    Plaintiffs repeat, reallege, and incorporate all foregoing and subsequent paragraphs as if fully set forth herein.

138.    Plaintiffs and the Class members conferred measurable benefits upon Defendants, including (a) the money they deposited and lost wagering on Defendants' illegal gambling platform; (b) the transaction fees Defendants charged on each contract; (c) the discounts, rebates, payments, and other consideration Defendants received from exchanges and counterparties in connection with Plaintiffs' and the Class's wagers, which Defendants retained for their own account without disclosing the amounts received; (d) the trading profits Defendants' affiliates realized by taking positions adverse to Plaintiffs and the Class; and (e) the licensing, compliance, tax, and responsible-gaming costs Defendants avoided by operating outside the regulatory frameworks that govern licensed sports wagering operators.

139.    Defendants knew of and appreciated these benefits. Defendants track every deposit, wager, fee, and position on their platform, they report the resulting volumes and revenues to investors, and they have described the DraftKings Predictions business as generating approximately $3.4 billion in annualized consumer volume, the substantial majority of it attributable to sports wagering placed from states where online sports betting is illegal.

140.    Under principles of equity and good conscience, Defendants should not be permitted to retain the money obtained from Plaintiffs and the Class, which Defendants have unjustly obtained as a result of its unlawful operation of its "prediction market".

141.    As it stands, Defendants have retained millions of dollars in profits generated from

its unlawful wagers and should not be permitted to retain those ill-gotten profits.

142.    Plaintiffs plead this claim in the alternative to their statutory claims. To the extent any contract between Plaintiffs and Defendants purports to authorize Defendants' retention of these amounts, that contract is void or unenforceable as a gaming contract and as a contract to perform an illegal act, and Plaintiffs therefore have no adequate remedy at law arising from it. Retention of the benefits identified above would be inequitable because they were obtained through conduct that state law prohibits and that Defendants concealed from the consumers who paid them.

143.    Accordingly, Plaintiffs and the Class members seek full disgorgement of all money Defendants have retained as a result of the unlawful and/or wrongful conduct alleged herein.

**B.    State Specific Claims.**

## TEXAS COUNT I

### VIOLATIONS OF TEXAS PENAL CODE CHAPTER 47 - GAMBLING

### Tex. Penal Code § 47.01 et seq.

### (Texas Class Against All Defendants)

144.    Plaintiffs repeat, reallege, and incorporate all foregoing and subsequent paragraphs as if fully set forth herein.

145.    Texas Penal Code Chapter 47, §§ 47.01–47.06 prohibits gambling, gambling promotion, keeping a gambling place, and possessing a gambling device, absent a statutory exemption.

146.    "Gambling" is defined to include making a bet on the partial or final result of a game or contest or on the performance of a participant in a game or contest. Tex. Penal Code § 47.01(4).

147.    Defendants' operation of DraftKings Predictions accepts wagers on the outcomes

44

of sporting events from consumers in Texas without any license or statutory exemption authorizing such activity, in violation of Chapter 47.

148.    Plaintiff Gordon, Plaintiff Weissmann, and the Texas Class members each lost money at gambling to Defendants through DraftKings Predictions, and Defendants received and retained those amounts together with the transaction fees charged on each wager.

149.    Texas law voids contracts and considerations founded, in whole or in part, on an illegal gambling transaction, and permits a person who has lost money at gambling to recover that money from the person who won it. See Tex. Bus. & Com. Code ch. 35, subch. D (Void Gaming Contracts), §§ 35.51–35.53. Because Defendants operated DraftKings Predictions as an unlicensed gambling enterprise in violation of Texas Penal Code Chapter 47, the amounts wagered and lost by Plaintiff Gordon, Plaintiff Weissmann and the Texas Class members on DraftKings Predictions are recoverable under Texas law.

150.    Defendants operated their unlawful gambling enterprise knowingly and for profit, accepting wagers from Plaintiff Gordon, Plaintiff Weissmann and the Texas Class members on the outcomes of sporting events through DraftKings Predictions without obtaining any license or exemption under Texas law.

151.    Pursuant to Texas law, Plaintiff Gordon, Plaintiff Weissmann and the Texas Class members are entitled to recover from Defendants the amounts they paid, wagered, or lost through DraftKings Predictions, together with costs and any other relief available under Texas law.

## TEXAS COUNT II

### VIOLATIONS OF TEXAS DECEPTIVE TRADE PRACTICES ACT

### Tex. Bus. & Com. Code §§ 17.41–17.63 ("DTPA")

### (Texas Class Against All Defendants)

45

152. Plaintiffs repeat, reallege, and incorporate all foregoing and subsequent paragraphs as if fully set forth herein.

153. Plaintiff Gordon, Plaintiff Weissmann, and the Texas Class members are "consumers" within the meaning of Tex. Bus. & Com. Code § 17.45(4) because they sought or acquired services from Defendants by purchase, and Defendants are "persons" within the meaning of § 17.45(3).

154. More than sixty days before the assertion of this claim, on April 29, 2026, Plaintiffs, through counsel, provided Defendants with a written pre-suit demand that reasonably described the unfair and deceptive acts and practices complained of and the injuries suffered by Plaintiffs and similarly situated consumers, and that demanded an accounting and refunds. Defendants responded in writing on May 29, 2026 and refused to tender any settlement amount. To the extent the Court concludes that the notice required by Tex. Bus. & Com. Code § 17.505(a) was not fully satisfied as to any theory, notice was impracticable within the meaning of § 17.505(b) because Defendants' conduct is ongoing and limitations continue to run, and Plaintiffs respectfully submit that abatement under § 17.505(c)—not dismissal—would be the appropriate remedy.

155. Defendants' operation of DraftKings Predictions in Texas without a license constitutes an unlawful, unconscionable, and deceptive act or practice under the Texas Deceptive Trade Practices–Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41–17.63 ("DTPA").

156. DraftKings offers DraftKings Predictions to Texas consumers even though DraftKings is not licensed to operate an online sportsbook there.

157. Texas Penal Code Chapter 47, §§ 47.01–47.06 prohibits gambling promotion, keeping a gambling place, and possession of a gambling device absent a statutory exemption, and

Defendants' operation of DraftKings Predictions in Texas violates these provisions.

158.    Defendants' violation of Texas's gambling laws, and their marketing of an illegal gambling product to Texas consumers stripped of the safeguards that lawful operators must provide, constitute an unconscionable action or course of action under DTPA §§ 17.45(5) and 17.50(a)(3), because Defendants took advantage of consumers' lack of knowledge, ability, experience, and capacity to a grossly unfair degree. Defendants' representations that DraftKings Predictions is a lawful "prediction market" rather than unlicensed sports wagering, and that users are "trading" with one another rather than wagering against Defendants and their affiliates, constitute false, misleading, and deceptive acts or practices under DTPA § 17.46(b), including § 17.46(b)(5) (representing that services have characteristics or benefits they do not have), § 17.46(b)(7) (representing that services are of a particular standard or quality when they are of another), § 17.46(b)(12) (representing that an agreement confers or involves rights, remedies, or obligations it does not have), and § 17.46(b)(24) (failing to disclose material information with the intent to induce a transaction into which the consumer would not have entered had the information been disclosed).

159.    Plaintiff Gordon, Plaintiff Weissmann, and the Texas Class members relied to their detriment on Defendants' representations and omissions in deciding to open accounts, deposit funds, and place wagers on DraftKings Predictions, and Defendants' unlawful, unconscionable, and deceptive conduct was a producing cause of their economic damages, which include the amounts they deposited and lost, the transaction fees they paid, and the inflated effective prices they were charged.

160.    Pursuant to DTPA § 17.50, Plaintiff Gordon, Plaintiff Weissmann and the Texas Class members are entitled to recover their economic damages, up to three times their economic

47

damages for Defendants' knowing conduct, and reasonable and necessary attorneys' fees and costs.

## CALIFORNIA COUNT I

## VIOLATIONS OF CALIFORNIA'S GAMBLING CONTROL ACT

## Cal. Bus. & Prof. Code §§ 19800 et seq.,

## (California Class Against All Defendants)

161.    Plaintiffs repeat, reallege, and incorporate all foregoing and subsequent paragraphs as if fully set forth herein.

162.    California's Gambling Control Act, Cal. Bus. & Prof. Code §§ 19800 et seq., provides that all gambling operations and persons having significant involvement therein must be licensed, registered, and regulated, and that "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state." Cal. Bus. & Prof. Code § 19801(d).

163.    Defendants have not applied for or obtained any license under the Gambling Control Act, and their operation of DraftKings Predictions in California therefore violates the Act.

164.    Plaintiff Harris pleads Defendants' violations of the Gambling Control Act and of California Penal Code §§ 330, 337a, and 337j both as independent grounds for restitution of amounts paid under void and illegal gambling transactions and, in the alternative, as predicate "unlawful" acts supporting the claim under California's Unfair Competition Law pleaded below.

165.    Defendants further violate California Penal Code § 330, which makes it a misdemeanor to conduct, as owner or employee, any banking or percentage game played with a device for money or other representative of value. Defendants operate an illegal banking game when they trade as the House through their market makers, and an illegal percentage game when they collect fees on bets made by consumers.

48

166. Defendants also violate California Penal Code § 337a, which prohibits pool selling and bookmaking and receiving, holding, or recording money staked, pledged, bet, or wagered upon the result of a contest, and California Penal Code § 337j(a)(2), which prohibits receiving compensation or a share of revenue for keeping, running, or carrying on a controlled game. Defendants act as a bookmaker, accept pooled bets on the results of sporting events, and directly receive compensation by taking a share of consumers' bets.

167. As a direct result of Defendants' violations of California's gambling laws, Plaintiff Johnny Harris and the California Class deposited funds and placed wagers on DraftKings Predictions and suffered monetary losses.

168. Defendants have been unjustly enriched by retaining the amounts wagered and lost by Plaintiff Harris and the California Class through Defendants' unlicensed and unlawful gambling operation.

169. Plaintiff Johnny Harris and the California Class are entitled to restitution and disgorgement of all amounts Defendants unlawfully obtained from them through DraftKings Predictions in violation of California's gambling laws, together with injunctive relief and any other remedy available under California law.

## CALIFORNIA COUNT II

### VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW

### Cal. Bus. & Prof. Code §§ 17200 et seq. ("UCL")

### (California Class Against All Defendants)

170. Plaintiffs repeat, reallege, and incorporate all foregoing and subsequent paragraphs as if fully set forth herein.

171. Plaintiff Johnny Harris, Defendants and California Class Members are "persons"

49

within the meaning of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq. ("UCL").

172. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice," each of which is separately actionable.

173. Defendants violated the UCL's prohibition against engaging in "unlawful" conduct by virtue of, inter alia:

a. California's Gambling Control Act, Cal. Bus. & Prof. Code §§ 19800 et seq., because Defendants have not applied for or obtained any state gambling license, and "no person in this state has a right to operate a gambling enterprise except as may be expressly permitted by the laws of this state," Cal. Bus. & Prof. Code § 19801(d);

b. California Penal Code § 330, because Defendants conduct illegal banking games when they trade as the House through their market makers and illegal percentage games when they take fees on bets made by consumers; and

c. California Penal Code §§ 337a and 337j(a)(2), because Defendants act as a bookmaker, accept pooled bets on the results of sports events, and directly receive compensation by taking a share of consumers' bets.

174. Defendants' conduct also constitutes "unfair" business acts and practices under the UCL because it is unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous, and the gravity of Defendants' conduct outweighs any conceivable benefit of such conduct.

175. Defendants' conduct also constitutes a "fraudulent" business act or practice under the UCL because Defendants' representations and omissions—that users are "trading" or

50

"predicting" rather than wagering, that the product is lawful, that participants trade with one another in a neutral marketplace, and that the advertised odds reflect the cost of a transaction—are likely to deceive reasonable members of the public. Plaintiff Harris actually relied on those representations and omissions in deciding to open an account, deposit funds, and place wagers, and he would not have done so had the truth been disclosed.

176.   Defendants have, in the course of trade or commerce, tricked California consumers into believing that the operation of DraftKings Predictions is lawful in California, when it is not, and have further tricked consumers into believing they are not gambling against the House, causing Plaintiff Harris and the California Class to be tricked out of money paid to Defendants.

177.   Plaintiff Harris and the California Class have suffered injury in fact and lost money or property within the meaning of Cal. Bus. & Prof. Code § 17204, in the form of the amounts they deposited and lost on DraftKings Predictions and the transaction fees they paid, and they seek restitution and disgorgement of those amounts, public injunctive relief, and their attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5. Plaintiff Harris pleads his equitable UCL claim in the alternative to his legal claims, and he lacks an adequate remedy at law to the extent his legal remedies would not reach amounts Defendants obtained indirectly through fees, rebates, and affiliate trading profits, or to the extent damages would not prevent Defendants' continuing conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request, individually and on behalf of all others similarly situated, the following relief:

1.       For an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, defining the Class as requested herein, appointing Plaintiffs as class representatives and their counsel as class counsel;

2.       Awarding Plaintiffs all economic, monetary, actual, consequential, compensatory, and punitive damages available at law and to be determined by proof;

3.       Awarding Plaintiffs and the Class members appropriate relief, including actual damages, statutory damages, and multiple damages, including not less than double and up to treble damages under Mass. Gen. Laws ch. 93A, § 9(3), the amounts lost in contract under Mass. Gen. Laws ch. 137, § 1 and, in the alternative, treble the value of unrecovered losses in tort under that section, and up to treble economic damages under Tex. Bus. & Com. Code § 17.50(b)(1);

4.       Awarding Plaintiffs' reasonable attorneys' fees, costs, and other litigation expenses, including under Mass. Gen. Laws ch. 93A, § 9(4), Tex. Bus. & Com. Code § 17.50(d), and California Code of Civil Procedure § 1021.5;

5.       Awarding pre- and post-judgment interest, as allowable by law;

6.       For an order enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

7.       Declaratory and equitable relief, including restitution and disgorgement;

8.       For an order declaring that the release, disclaimer, limitation-of-liability, contractual limitations-period, and remedy-waiver provisions of the DraftKings Predictions Terms of Use are void and unenforceable as applied to the statutory claims asserted herein;

9.       For an accounting of all amounts Plaintiffs and Class members deposited, wagered, and lost on DraftKings Predictions, and of all fees, rebates, payments, and trading profits Defendants and their affiliates received in connection with those transactions;

10.   For public injunctive and declaratory relief as the Court may deem proper; and

11.   Awarding such further and other relief as the Court deems just, proper and equitable.

## JURY DEMAND

Plaintiffs request trial by jury of all claims that can be so tried.

Dated: August 3, 2026

Respectfully submitted,

BY: /s/ Scott C. Harris
Scott C. Harris
Massachusetts Bar No. 714774
Bryson Harris Suciu DeMay, PLLC
900 W. Morgan St.
Raleigh, NC 27603
Tel.: (919) 600-5000
Email: sharris@brysonpllc.com

James R. DeMay*
Bryson Harris Suciu DeMay, PLLC
900 W. Morgan St.
Raleigh, NC 27603
Tel.: (704) 941-4648
Email: jdemay@brysonpllc.com

J. Hunter Bryson*
Bryson Harris Suciu DeMay, PLLC
11 Park Place, 3rd Floor
New York, NY 10007
Tel.: (919) 539-2708
Email: hbryson@brysonpllc.com

*** Pro hac vice forthcoming**